

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00012-CR

SEAN FOX                                                                   APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

------------

### FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

----------

In this case involving sexual abuse by a father against his young daughter, a jury convicted Appellant Sean Fox of one count of aggravated sexual assault of a child (penile penetration of her mouth) and one count of indecency with a child (causing her to touch his genitals) and assessed his punishment at forty-five years' confinement and a $10,000 fine for the offense of aggravated sexual assault of a child and twenty years' confinement and a $10,000 fine for the

---

[1]*See* Tex. R. App. P. 47.4.

offense of indecency with a child. The trial court sentenced Appellant accordingly, cumulating the two sentences. In two points, Appellant contends that the trial court abused its discretion by denying his motion for mistrial based on a juror's relationship with a State's witness and by admitting punishment evidence showing that Appellant had been sexually abused when he was a child. Because we hold that the trial court did not reversibly err, we affirm the trial court's judgment.

**Withholding of Information By Juror**

In his first point, Appellant contends that the trial court abused its discretion by denying his motion for mistrial when it was discovered at trial that a juror had failed to reveal during voir dire that he was related to State's witness Carol Goldberg, the nurse who had performed the sexual assault examination of the female complainant, M.F. In the trial court's introductory remarks to the venire panel, the trial court explained,

> There's one area of questioning wherein the attorneys are allowed to give to you some specific facts or information concerning this case, but it's for a very—or these cases, but it's for a very limited inquiry. And it will be so that they can give you enough information that you can determine for yourselves whether you have any personal knowledge concerning these cases, whether you've heard anything about them, read anything about them, or perhaps know any of the witnesses who may be testifying. So for that very limited inquiry, the attorneys may give to you some specific information concerning the facts of these—these cases. And that may be one area of questioning that will take place.

> In the State's voir dire, the prosecutor asked the venire panel,

All right. Now I'm going to read off a list of potential witnesses. If you know any of the potential witnesses or think you know any of the potential witnesses, raise your hand, keep it up, and after I've finished the whole list, I'll come talk to you. Make sense to everybody?

Okay. [M.F.], [Mc.F.], [S.F.], [J.S.], *Carol Goldberg*, [K.D.], Suzy Davis, Dena Williams, Phylles Jackson, Rebecca Truette, Lisa Martinez, Erica Hanson, Lisa Sohel, Rebecca Torres West, Jennifer Ware, Jodi Binion, Victoria Newton, [McK.F.], [L.F.], [T.S.], Jack Grassman, Sam Mooney, Larry Kish, Jerold Hoffee, or Angelo Guardia. Does anybody think they know any of those potential witnesses?

And don't freak out and think you're going to be here for a month. That's just a potential witness list. We put down everybody that could potentially be called, but if you're over here, you're not going to have that many witnesses testify during the trial.

Okay. So nobody thinks they know any of the witnesses? Okay. Congratulations. You're all still qualified to serve. [Emphasis added.]

In the defense voir dire, the following exchange occurred:

VENIREPERSON: I'm supposed to be on a plane Thursday afternoon. You really think it's going to take that long?

[DEFENSE COUNSEL]: It's hard to say. You saw the State's witness list. He says he's not calling them all. We may have some witnesses too. So it's hard to say . . . .

Later, defense counsel also said, "I think [the prosecutor] did a good job of asking if you know anybody, and Mr. Francomano[, a member of the venire panel,] stated that I'd represented him before." Defense counsel then questioned the panel members about their relationships with police officers. Defense counsel did not otherwise address the issue of the panel's knowledge of the parties, the trial judge, the attorneys, or the witnesses.

3

In the State's opening statement, the prosecutor stated,

There's going to be a nurse, *Carol Goldberg*, that will tell you here in court about her examination of [M.F.] She'll talk to you about what [M.F.] told her, and she'll tell you that there was no physical evidence that she found, and she'll explain to you why that was, because too much time had elapsed. [Emphasis added.]

Before testimony began, many of the State's witnesses were sworn in and placed under the Rule; Goldberg was not among them. After a break during M.F.'s testimony, Goldberg testified out of order. Her testimony showed, among other things, that she had been a sexual assault nurse examiner (SANE) nurse more than ten years. After the State passed the witness, the trial court conducted a bench conference. The following occurred:

[THE COURT:] Okay. For the record, while this witness was on the stand, I believe one of the jurors called the bailiff over, spoke to him, and the bailiff gave me a note that says one of the jurors said that he knows this witness, related by marriage. And I just now shared that information with counsel for the State and the defendant.

And I believe, [Defense Counsel], you're asking the court to speak to this juror. We'll bring him in and put it on the record and find out if this would in any way affect his ability to be fair and impartial, correct?

[DEFENSE COUNSEL]: That, and I'd also like to know if he's ever talked to Ms. Goldberg about her work in general. I think that would be appropriate to ask.

THE COURT: Okay. All right. Do you want to get the individual?

(Pause in Proceedings)

THE COURT: Okay. Sir, you can have a seat in the jury box if you want to.

4

For the record, would you state your name.

JUROR: Dale Rice.

THE COURT: Okay. Mr. Rice, while this last witness, Ms. Goldberg, was on the stand, I believe you called the bailiff over and divulged to him that, in fact, you knew Ms. Goldberg. And the note I got said that you were related to her by marriage. Is that correct?

JUROR: Yes, ma'am.

THE COURT: When the State read out the witness list during voir dire, I assume you did not hear her name or relate it.

JUROR: I didn't connect the dots.

THE COURT: Okay. Now knowing that she is a witness and you've heard part of her testimony anyway, what I need to know from you is whether that relationship with her in any way would affect you to a degree that you could not be a fair and impartial juror in this case.

JUROR: No, ma'am, I don't believe it will.

THE COURT: Okay. And I know that the attorneys are going to want to know when you say "I don't believe it will," you know yourself better than anybody here, can you say, yes, it would, or, no, it wouldn't?

JUROR: No, it won't.

THE COURT: And have you ever had any discussions with Ms. Goldberg about this type of work that she does?

JUROR: No, ma'am, have not.

THE COURT: And certainly no discussions concerning this case. Would that be correct?

JUROR: That's correct.

THE COURT: Is there anything at all about that relationship— and we all appreciate your honesty in bringing it up as soon as you realized the problem. Is there anything at all about that relationship

that you think that anyone here needs to know that could affect your service as a juror?

JUROR:  No, ma'am.

THE COURT:  Does the State have any other questions that you want to ask?

[PROSECUTOR]:  No, Your Honor.

THE COURT:  [Defense Counsel], do you?

[DEFENSE COUNSEL]:  I'm sorry.  I didn't catch the relationship of Ms. Goldberg by marriage.  What's the exact relationship?

JUROR:  My—she's my daughter's husband's sister.

[DEFENSE COUNSEL]:  And how many opportunities have you had to interact with Ms. Goldberg over the past ten years?

JUROR:  Four or five.

THE COURT:  But you're telling the court that it's had nothing to do with her job or the type of information that—

JUROR:  More family settings, family celebrations.

THE COURT:  Anything else?

[DEFENSE COUNSEL]:  Nothing further at this time.

THE COURT:  Okay.  If you'd go back with the bailiff.  Thank you very much, sir.

(Juror excused)

THE COURT:  Okay.

[DEFENSE COUNSEL]:  Your Honor, at this time the defense would move for a mistrial based upon the fact that Mr. Rice certainly is one of the individuals that I had identified as a possible strike.  We relied upon his answer, if you will, his silence to the question proposed by [the prosecutor], does anybody know these witnesses.

6

He said Carol Goldberg. There was no response from anyone. I believe it's certainly reasonable to think that I would have stricken him had I had known he was related in any way to Ms. Goldberg, one of the State's chief witnesses. I would have at least had the chance to better develop that at the time.

So I move for a mistrial or, alternatively, move to strike Mr. Rice from the panel and proceed with 11 jurors.

. . . .

THE COURT: Okay. . . . I'm not going to do the 11 because I don't think—I don't think that the law provides for that. I just—I don't.

And, you know, you might—if there is an appeal of this case, you might not be the attorney, and then I would—you know, we'd be in a bad spot. So I'm not going to do that.

But as far as your position that you're entitled to a mistrial because you were not able to use your strikes with that information, I know there's case law out there on similar issues such as this. And I guess my position at this point is that I'm going to deny the request at this time, but if you can provide me some authority—I mean, let's keep going. If you can provide me some authority at a later point in time in the trial that says that you would be entitled to that mistrial, I would be more than willing to revisit that issue.

And y'all might look and see as well, as I will. . . .

As our sister court in Texarkana has explained,

The Sixth Amendment guarantees the right to a trial by an impartial jury. One aspect of this constitutional right is the opportunity to conduct "an adequate voir dire to identify unqualified jurors." In *Salazar v. State,* the Texas Court of Criminal Appeals held that, "where a juror withholds material information during the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury." If the juror did not intentionally withhold this information, that fact is nonetheless "largely irrelevant" in determining whether the information withheld was material. Therefore, if a situation arises where *material* information was withheld by a juror during voir dire, and if the appellant's subsequent

7

motion for mistrial is denied, on appeal the denial of that motion will be reviewed for constitutional error. Stated differently, in such a situation, we must reverse the trial court's ruling on the motion for mistrial unless we are convinced beyond a reasonable doubt that a juror's withholding of *material* information did not contribute to the defendant's conviction or punishment.[2]

Defense counsel is entitled to rely on the questions asked by the trial court and prosecutor.[3] Diligence is therefore not at issue; materiality is. We need not reach that issue, however, because we are convinced beyond a reasonable doubt that the juror's withholding of his relationship with Goldberg did not contribute to Appellant's conviction or punishment; that is, we are convinced that even if the trial court did abuse its discretion by denying the mistrial, which we do not hold, any error would be harmless.[4] In making this determination, our primary question is whether there is a "reasonable possibility" that such error might have contributed to the conviction.[5]

---

[2]*Sypert v. State*, 196 S.W.3d 896, 900 (Tex. App.—Texarkana 2006, pet. ref'd) (footnotes and citations omitted).

[3]*Armstrong v. State,* 897 S.W.2d 361, 364 n.1 (Tex. Crim. App. 1995).

[4]*See* Tex. R. App. P. 44.2(a); *Franklin v. State,* 138 S.W.3d 351, 354 (Tex. Crim. App. 2004); *Sypert*, 196 S.W.3d at 900; *see also Uranga v. State*, No. PD-0385-08, 2010 WL 4628550, at *4 (Tex. Crim. App. Nov. 17, 2010) (noting that the issue in *Uranga* is juror bias and distinguishing *Franklin*, where the issue was, as it is in the case before us, "what standard of harm should be applied to the denial of a mistrial based on the juror's withholding of material information").

[5]*See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the remaining record.[6] We evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution."[7]

In *Franklin*, the trial court refused to allow defense counsel to question a juror who did not respond in voir dire that she knew the complainant when the juror was in fact later revealed to be the complainant's Girl Scout troop assistant leader.[8] The trial court's refusal further compounded the constitutional violation that had occurred when the juror withheld the information originally, and the *Franklin* court relied on the trial court's refusal in holding the constitutional error harmful.[9] In the case before us, however, the trial court held a hearing during the trial on the issue of the juror's actual bias, as detailed above, and allowed defense counsel to question the juror about his relationship with Goldberg.

The prosecutor referred to the testimony of Goldberg in his opening statement:

---

[6]*Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).

[7]*Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989).

[8]*Franklin*, 138 S.W.3d at 352.

[9]*Id.* at 354–57.

[M.F., the complainant,] told a little at a time because it was hard. Well, the police are stepping in at this point, the Carrollton police, the Allen police. And [M.F.] is sent for what's called a sexual assault nurse exam. That's SANE. There's going to be a nurse, *Carol Goldberg*, that will tell you here in court about her examination of [M.F.] She'll talk to you about what [M.F.] told her, and she'll tell you that there was no physical evidence that she found, and she'll explain to you why that was, because too much time had elapsed. [Emphasis added.]

M.F. was the State's first witness. She testified that she was eleven years old and in the sixth grade at the time of trial. She initially told the jury about early sexual experiences with her father, Appellant, that occurred in Idaho and then described three acts of aggravated sexual assault—digital-vaginal penetration, digital-anal penetration, and penile-oral penetration that occurred in a hospital in Collin County, Texas. She clarified that in her narration, she used the term "front private" to indicate a person's body part used to go "pee."

M.F. next told about visiting Appellant and her stepmother in Carrollton. M.F. testified that on one occasion, she had an infection on her "front private," and her stepmother told Appellant to put cream on it because she was leaving. M.F. testified that she was on Appellant's bed, wearing just a T-shirt, and Appellant, wearing only his boxers, put the cream on her slowly. She stated that Appellant applied the cream differently than her mother did it. After Appellant applied the medication, M.F. testified that "[they] let it air out. And then he asked [her] if [she] remembered the game . . . , and [she] told him yeah. And he asked if [she] wanted to play it." M.F. testified that she told Appellant "yeah" "because [she] didn't know it was bad at that age." M.F. testified that Appellant removed

10

his boxers and that she and Appellant then touched each other's "front private[s]." M.F. stated that her little brother, Mc.F., knocked on the door, and Appellant asked him "if he wanted to know how to play." M.F. then told the jury that Appellant took Mc.F.'s pants off, they all three "sat in a triangle kind of circle," and each person touched the front privates of the other two persons with his or her hand. M.F. testified that she had not yet begun kindergarten when this event happened.

M.F. then discussed another incident that happened in Carrollton. Appellant, his wife, her son, M.F., Mc.F., and McK.F., their older brother, were outside playing baseball and flying kites. M.F. needed to go to the restroom, so Appellant took her inside. According to M.F.'s testimony, she "was still getting the hang of" wiping herself. Appellant wiped her after she relieved herself, and then "[her] pants were still down to [her] knees, and he was—he took down his pants and asked to play the game, and [she] said okay. And [they] were touching each other down there." M.F. clarified that they touched each other's "front privates" with their respective hands. M.F. testified that Appellant touched her inappropriately many other times but that she could not remember those times distinctly. But she also testified that she remembered the events that she had described for the jury very clearly.

After M.F. told her mother about the events, M.F. spoke with Lisa Martinez at the Collin County Children's Advocacy Center on two separate occasions, discussing first the events in Idaho and Collin County, and later the events in

11

Carrollton and Sanger.  M.F. testified that she did not tell everything during the first interview because she "was scared and nervous and still having trouble remembering everything."  She said that she had watched the videotapes of her interviews, that they were accurate, and that she had told the truth in the interviews.  The trial court admitted DVDs of both interviews, State's Exhibit 10 and State's Exhibit 11.

In the first interview, which occurred on August 9, 2007, about twenty-six months before trial, M.F. discussed events of indecency with a child by exposure and indecency with a child by digital-genital contact that she stated occurred in Idaho.  She also discussed an event that included digital penetration of the vagina that she described as having occurred in Collin County.

M.F. testified before the jury that she saw a nurse (Goldberg) who examined her and asked her questions about what had happened.  M.F. told the jury that she had told the nurse the truth.

Goldberg testified before M.F. was released as a witness.  Goldberg explained that she is a "sexual assault nurse for Collin County" and works mainly out of the Collin County Children's Advocacy Center.  Goldberg explained that a sexual assault nurse examiner, "called a SANE nurse . . . , is a registered nurse who is specifically trained to do a comprehensive exam on a sexual assault patient."  Goldberg testified that she received training—fifty-six classroom hours, ninety-six clinical hours, and twenty courtroom hours—by the Office of the Attorney General in Texas, that she had to repeat training every two years, and

12

that she was currently certified as a SANE nurse for both adult and pediatric patients. As of the time of trial, she had been "doing exams alone out of the advocacy center" for about ten years.

Goldberg explained that she performs one to four "nonacute" examinations every week, that she had been doing so for the last ten years, and that in all, she had performed several hundred examinations. Goldberg then explained the procedure:

> A SANE exam is when we go to the advocacy center, we have a room that we use. It's called the SANE room. It's a room filled with teddy bears, things for children. We go in there and try to talk to them on their level. And it starts with the exam being a verbal history, writing everything down they say, in quotations. And then a head-to-toe assessment, looking for trauma, and a detailed genital exam. And if there would be trauma, then we would do a kit, a rape kit.

Goldberg explained that a "nonacute" or scheduled examination (an examination without a rape kit) would occur if the report of sexual assault was made more than 72–96 hours after the alleged incident. She also explained that the advocacy center receives referrals mainly from law enforcement, who provide contact information for the child so that the advocacy center can schedule appointments.

Goldberg stated that she examined M.F. on April 8, 2008 subsequent to the advocacy center receiving a referral from the Allen Police Department. The evidence shows that the examination occurred about three weeks after M.F.'s second interview at the advocacy center. First, Goldberg obtained a verbal

13

history from M.F. outside the presence of her parents. At trial, Goldberg read aloud from the written examination report:

> Starting when I was three, my dad, Sean, one time when we were in Carrollton or Allen, he made me massage his private part like this— in parentheses, hand motion done. We were both naked, and the yellowish little thing shooted out on my private. One time in Carrollton he put his private in my mouth. I told him I didn't want him to. He put his finger in my bottom hole and in my vagina hole. He had me massage his private, and he made me and my brother [Mc.F.] do stuff together, like he made us touch each other's private.
>
> When it first started and I was little, I told my mom. She said, I'm going to have to talk to Dad about that.
>
> I said, no, don't; I don't want him to go to jail.
>
> And then it gets—it's kind of crossed out, but it begins saying: I'm going to have to call the police.
>
> The very, very last line I'm unable to totally read. The quotation is ended on the next page with, it says history continued, mom again: She said we would get counseling and call the police. End of quotations. So there's one line that I cannot read.

After obtaining the verbal history, Goldberg explained, she had performed a genital examination on the child using a colposcope, which magnifies the object observed. M.F.'s mother was present for the genital examination. Goldberg noted no trauma to M.F.'s genitals. Goldberg stated that in the majority of nonacute cases she saw, she would not see any injury. She explained that "the female sexual organ is very, very vascular, very estrogenized," and she likened an injury to it to biting the inside of one's mouth, noting that such an injury "would maybe be red and hurt, and then 48, 72 hours later it's totally fine."

14

Goldberg testified that M.F. told her that Appellant was the person who had assaulted her.

On cross-examination, Goldberg testified that she had no knowledge of any prior SANE examinations of M.F. or any prior visits of M.F. and her mother to the advocacy center. She repeated that her examination had not shown any kind of trauma, and she admitted that it also did not show "any kind of penetration." On redirect, Goldberg testified that in 80% of nonacute cases that she saw, there was no trauma. On cross-examination, she admitted that there would also be no trauma if no assault had occurred. The trial court admitted State's Exhibit 12, a copy of Goldberg's medical notes and report, after Appellant stated, "No objection, Your Honor."

After the trial court released Goldberg, M.F.'s second videotaped interview was published to the jury. In the second interview, which occurred about six and one-half months after the first interview, M.F. gave more details about offenses that she stated happened in Texas. She told Martinez that she wanted to tell her more information about what her father had done to her and that she had not told her everything in the first interview because she barely knew Martinez and was in unfamiliar surroundings. M.F. described an event that she said happened in an Allen, Texas hospital bathroom. She stated that Appellant "massaged" her private and made her "massage" his. She told Martinez that Appellant then put his finger in "[her] hole down there" and "up [her] butthole." When Martinez asked how it felt, M.F. answered, "Painful." She told Martinez that she told

15

Appellant to stop and that she wanted her mother. M.F. said that then he "tried to get [her] to put [her] mouth on his privates." M.F. told Martinez that Appellant said, "I'm your dad. It's okay." M.F. told Martinez that she believed that she was five years old when this event occurred.

M.F. then told Martinez about an event that had occurred in Carrollton. Appellant applied cream to M.F.'s genitals for medical purposes. (Her stepmother had left; he asked M.F. if she needed help applying the cream, and she said, "Yes.") M.F. told Martinez that Appellant rubbed inside the labia, slowly. Then, M.F. lay on his bed to "let it air out down there." According to M.F., Appellant then licked her private and directed her to put her mouth on his private, which she did. M.F. told Martinez that "something shooted into [her] mouth," that it was both soft and hard and "tasted like boogers," that it made her mouth feel "weird and numbish," that she accidentally swallowed it, and that Appellant said, "Oopsies." Appellant told Martinez that she was five and one-half or six years old when this event happened. M.F. said that Appellant then brought in her younger brother, Mc.F., and told the two of them "to mess around with each other's privates."

She also stated that another time, either in Sanger or Carrollton, the three of them sat in a circle, with their lower bodies unclothed, and took turns "hitting" each other's privates. She demonstrated that the "hitting" was actually gentle tapping. M.F. told Martinez that Appellant made them put their mouths on each other's privates.

16

M.F. also described an incident that occurred in Appellant's office in Sanger, which she described as being an outbuilding on the same property as the home he shared with his wife and stepson. In the office, she and Appellant were "messing around with each other's privates." She told Martinez that something "shooted out" of his penis; he picked it up off the floor and flushed it.

Finally, M.F. told Martinez about an event that had happened in her stepmother's bathroom when the rest of the family was outside. Appellant asked her if she "wanted to play one of [their] games." She said, "Sure." They both removed their pants and undergarments. He played "peekaboo" with his private, and then she followed suit. They then "mess[ed] around with each other's privates."

After the jury saw the second videotaped interview, Martinez, a former forensic interviewer who had interviewed M.F. both times, testified. Martinez stated that she had been a forensic interviewer for about five years and had conducted more than 1,200 interviews. In response to the prosecutor's question regarding things she looks for in interviews that would be helpful for others in assessing credibility, Martinez testified,

> Some things that we always try to look for are, like, sensory details. Sensory details is something that they felt, something that they tasted, something that they saw when they're describing something, how they—what it smelled like. Things like that are from your five senses.
>
> A lot of the times children can tell you how it felt to their body. So if something happened to them and they're able to say, you know, he touched me in my pee pee and it hurt, obviously that's

17

something that leads you to believe that it's something that they've experienced when they tell you sensory details.

It's also we're looking for, you know, when they're using their own body to demonstrate. If they're, you know, using their hands to show you how they were touched or what they had to do or things like that. We're also looking for sequential order. If they're telling you a story and it's going from, you know, what is it that happened, then what happened next, then what happened next, that they're able to tell you. Also if it's they're telling you A, B, C, and D, and I go from A to C and then back to A, if they're able to follow me on that with more focused questions.

Also looking for surrounding details, if they're able to tell me where, like, their parent was, where their brothers were, where—who—if anyone else was around there, who did it happen with, to describe them, things like that, of those nature. So we're looking for a lot of different things during—as the interview is going on.

Martinez testified that M.F. provided sensory information, surrounding details, and sequencing information, giving examples from M.F.'s interview.

Martinez explained that time would be the most difficult concept for children in relaying the offenses and that "most of the time, they can't give you the date." She also explained that "gradual" or "tentative" disclosure, or when a child tells what happened but not the whole story, is common and is the child's way of "testing the waters" to determine whether he is being believed and supported. She also explained that being able to determine what to tell, whom to tell, and when to tell gives the children "the only sense of control that they do have." According to Martinez, "Most of the time children give a lot more details after going into therapy or after knowing that, you know, they're going to be supported and things like that."

18

Martinez did not know whether a SANE examination was performed on M.F. in August 2007.

M.F. returned to the stand after Martinez's testimony. She testified that Appellant put his front private in her mouth "[a]bout twice," that one of these events happened in the bathroom at the hospital, and that the other one must have happened in Carrollton, even though she did not remember its details.

M.F.'s maternal grandmother, J.S., testified that the family had gone to the Allen hospital a little more than six years before trial. J.S., Appellant, and three of the children, including M.F., were in the waiting room. M.F. began dancing around. Appellant watched her. M.F. then said that she had to go to the restroom, and Appellant "jumped up and said" that he would take her. Appellant and M.F. stayed in the restroom "for a long, long time," which J.S. estimated to be "at least ten minutes," and she thought that was "[v]ery odd." J.S. testified that M.F. was four and one-half or five years old at the time of the incident, potty trained, and able to go to the restroom on her own.

S.F., M.F.'s mother and Appellant's ex-wife, testified that M.F. had told her that the "bathtub" incident in Idaho that M.F. described for the jury (involving Appellant playing "peekaboo" with his penis and then fondling M.F.) had happened when S.F. was out of town. S.F. further testified that M.F. was approximately four to four and one-half years old when S.F. left the children for four days in Idaho with Appellant while she visited friends in Dallas.

19

Following S.F.'s testimony, M.F.'s former stepmother and police officers from Allen and Carrollton testified. The pertinent evidence clarified that the home of Appellant and the former stepmother in Carrollton, where M.F. alleged incidents took place, was in Denton County.

The State elected to proceed regarding Count 1, the aggravated sexual assault count, on M.F.'s testimony and statements in the second videotape regarding a time at Appellant's house in Carrollton when he had her put her mouth on his penis. Regarding Count 2, causing M.F. to touch his genitals, the State elected "to go on the offense where [M.F.] describes her and her brother [Mc.F.] being present and all of them touching each other."

The trial court also admitted Defense Exhibit 1, a DVD of Mc.F.'s interview with Martinez. In the interview, Mc.F. stated that he thought that Appellant had molested him but did not provide any details. At trial, none of Mc.F.'s testimony went to the specific counts involving M.F.

Defense witness Nelson Ligon, a friend of Appellant and S.F., testified that S.F. told him that there was physical evidence of Appellant's sexual abuse of M.F. and that M.F. might not be able to have babies, but S.F. then changed her story the next month.

In its initial closing argument, the State did not refer to Goldberg or her testimony at all. In its final closing argument, the prosecutor stated,

> I want to talk about the sexual assault nurse examination briefly. When Carol Goldberg talked to you, she said that this is

20

what [M.F.] told me. [M.F.] gave her a picture of this man sexually abusing her, gave her a picture of what this man had done.

And some of you may be wondering, well, what about physical evidence, what about tears, what about healing, what about scars, what about that issue, what about the hymen? If you touch the hymen, doesn't it break, doesn't it pop? She talked about that. No, it does not. She talked about that in over 80 percent of cases where there has been known sexual abuse there will be no physical evidence. There will be no physical findings. That's what we have in this case, ladies and gentlemen.

Given the entire record—the trial court's allowing Appellant to question the juror, the juror's testimony that he and Goldberg never discussed her work, and the multiple sources other than Goldberg who provided evidence of the conduct for which Appellant was indicted—M.F.'s extensive live testimony, the forensic videos, and the forensic interviewer's testimony, we are convinced beyond a reasonable doubt that the juror's withholding of his relationship with Goldberg did not contribute to Appellant's conviction or punishment.[10] We therefore overrule his first point.

**Punishment Evidence of Appellant's Childhood Sexual Conduct**

In his second point, Appellant contends that the trial court abused its discretion by overruling a rule 403 objection to punishment evidence showing that he "was the victim of acts of deviate sexual intercourse when he was a child." We note that the trial court instructed the jurors not to consider the extraneous acts unless they first found beyond a reasonable doubt that Appellant

---

[10]See Tex. R. App. P. 44.2(a).

21

had committed them.  We also note that the trial court also admitted evidence of Appellant's drug use and burglaries committed when he was a teenager.

To the extent that Appellant complains about the evidence that his uncle sexually molested him when he was eight years old, we note that Appellant did not object to the evidence but in fact offered the evidence.  We therefore overrule such complaint.[11]

Regarding Appellant's remaining complaints about the admission of evidence that he and a younger cousin engaged in oral and anal sex when Appellant was twelve or thirteen years old and that at eight years old, Appellant had his four-year-old brother put his mouth on Appellant's penis, article 37.07, section 3(a) of the code of criminal procedure provides,

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.[12]

---

[11]*See* Tex. R. App. P. 33.1(a)(1); *Layton v. State*, 280 S.W.3d 235, 238–39 (Tex. Crim. App. 2009).

[12]Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2010).

In the punishment phase, evidence is relevant if it helps the jury determine the appropriate punishment for a particular defendant in a particular case.[13] Admissibility of evidence at punishment is more a matter of policy than of "logical relevance."[14] A defendant's choice of tattoos can reflect his character,[15] as can his gang membership.[16] Similarly, a defendant's extraneous sexual conduct can be probative of his character at punishment.[17]

But under rule 403, otherwise relevant punishment evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[18] Factors considered in our analysis of an issue regarding rule 403

---

[13]*Ellison v. State,* 201 S.W.3d 714, 719 (Tex. Crim. App. 2006).

[14]*Id.*

[15]*See Conner v. State,* 67 S.W.3d 192, 201 (Tex. Crim. App. 2001).

[16]*Jones v. State,* 944 S.W.2d 642, 653 (Tex. Crim. App. 1996) (noting that evidence of gang membership is relevant to show character), *cert. denied,* 522 U.S. 832 (1997).

[17]*Nenno v. State*, 970 S.W.2d 549, 564 (Tex. Crim. App. 1998) (holding evidence that Nenno, convicted of sexually assaulting and murdering a seven-year-old girl, patted the bottom of a nine-year-old girl, making her feel "mad and sad," admissible at punishment as fairly prejudicial), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999); *Hough v. State*, No. 03-01-00265-CR, 2002 WL 1025113, at *3 (Tex. App.—Austin May 23, 2002, pet. ref'd) (holding that pictures of partially naked and naked child who was not complainant were relevant to Hough's character, that their prejudicial effect was small compared to the facts of the offense, and that their probative value "correlates directly to their prejudicial value"), *cert. denied*, 543 U.S. 861 (2004).

[18]Tex. R. Evid. 403; *Rogers v. State*, 991 S.W.2d 263, 266–67 (Tex. Crim. App. 1999).

are (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence.[19]

In upholding the admission of punishment evidence that Nenno, convicted of sexually assaulting and murdering a seven-year-old girl, patted the bottom of a nine-year-old girl, making her feel "mad and sad," the Texas Court of Criminal Appeals reasoned,

> As for appellant's Rule 403 objection, the "inflammatory" nature of the evidence is that it tended to show that appellant was a child molester. Showing appellant to be a child molester was a perfectly legitimate purpose, and hence, while the evidence was "prejudicial," it was not unfairly so.[20]

Similarly, here, the State legitimately could have used the evidence to demonstrate that Appellant's adult sexual misconduct was deeply rooted in his childhood and not a new manifestation of his recent relapse into drug use. Moreover, we note that the State spent less than a page of the reporter's record asking questions about Appellant's self-reported childhood sexual experiences. Further, in closing argument at punishment, the prosecutor did not specifically refer to any of Appellant's childhood sexual experiences. The prosecutor encouraged the jury to look at Appellant's "actions over the years, all from when he was a child to the present" and stated, "[l]ook at what he's done during his life,

---

[19] *Reese v. State*, 33 S.W.3d 238, 240–41 (Tex. Crim. App. 2000).

[20] *Nenno*, 970 S.W.2d 564.

because your actions will show your true character." The prosecutor also argued,

> [W]hen you come up with a number, make sure that that number that you come up with is something that you can go back to your neighbors, and your community, and can say, Mr. Fox did this, this, and this, to his daughter, and he has done these other acts in his life, and because of all of that, we assessed his punishment at this.

Defense counsel, on the other hand, explicitly referred to the sexual experiences in closing argument to mitigate Appellant's punishment:

> What about his own past? [S.F.] talked about that. Experiences that he had of inappropriate touching. Didn't say he was at fault for that. She didn't say he started the incidents with his cousin, when he's 13, 12, 14, or the incident with his brother when he was eight. Did he start the incident with his uncle when he was eight?
>
> Is that what started some of this? Do we know what kind of demons he's been living with since he was eight years old?

Finally, given the jury's knowledge of the facts of the offenses for which Appellant was indicted and convicted, offenses committed by the adult Appellant against his own young daughter, we cannot say that his childhood sexual experiences would irrationally or indelibly affect the jury.

Consequently, we hold that the trial court did not abuse its discretion by admitting the evidence. We overrule Appellant's second point.

25

**Conclusion**

Having overruled both of Appellant's points, we affirm the trial court's judgment.

                                                    LEE ANN DAUPHINOT
                                                    JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 17, 2011